Richakdson, Ch. J.,
delivered the opinion of the court:
The actual claimants in this case are the Prairie State National Bank and Charles A. Hitchcock, who each seek to recover the amount admitted by the defendants to be due to one or the other.
Sundberg & Co. entered into a written contract with the defendants’ officers to build a custom-house at Galveston, Tex., and gave bond for its faithful performance with Charles A. Hitchcock and others as sureties.
They entered upon the work, and from time to time borrowed money from the Prairie State National Bank upon their own promissory notes. On January 24,1890, they owed the bank $5,000 on their promissory notes previously given, payable on demand. At the same time they had on deposit to their credit on the books of the bank $2,882.32.
On that date the bank made a demand of said Sundberg & Co. for payment of said notes and refused to make any other advances. Thereupon an oral arrangement was made, by which Sundberg & Co. were to have such additional loans as should be necessary to complete their contract, not to exceed $10,000, upon condition that they should forward to the bank a satisfactory order on the Government transferring the final payment of 10 per cent held back as security for their completion of the work under the following provision of the contract :
“Payments to be made in the following manner,'viz: 90 per cent (nine-tenths) of the value of the work executed to the satisfaction of the party of the first part will be paid from time to time as the work progresses in monthly payments (the said value to be ascertained by the party of the first part), and 10 per cent (one-tenth) thereof will be retained until the comple *202 tion of tbe entire work and tbe approval and acceptance of tbe same by tbe party of tbe first part, wbicb amount shall be forfeited by tbe said party of tbe second part in tbe event of tbe nonfulfillment of tbis contract, subject, however, to tbe discretion of tbe Secretary of tbe Treasury.”
To tbis arrangement both parties agreed, and it was carried out thereafter in tbe following manner: Tbe bank made loans to said Sundberg & Co. on their four promissory notes as follows:
1890. January 27. $3,500.00
February 8 . 3,500.00
May 12. 1,200.00
July 16. 1,350.00
Sundberg & Co. made, executed, and delivered to George Yan Zandt, tbe bank’s cashier, tbe following power of attorney:
“Office of Superintendent of Construction,
“U. S. Custom-House and Post-Office, etc.,
' , u Galveston, Tex., February 3,1890.
“Know all men by these presents that we, Charles Sundberg & Go., doing a general contracting business and residing in tbe city of Chicago, Illinois, do make and appoint George Yan Zandt, of tbe same place, to be our true and lawful attorney, for us and in our name to receive our last estimate from the United States of America on our contract for erection of United States custom-house at Galveston, Tex. (except interior finish). Said contract being signed by said Charles Sundberg & Co., and Will A. Freret for tbe United States of America. And we hereby ratify all our attorney may do by virtue hereof.
“Charles Sundberg- & Co.
“I hereby acknowledge tbe above as agent for tbe United States of America.
“C. D. Anderson,
“Superintendent of Construction.”
Yan Zandt, on February 8, sent tbis power of attorney to tbe Secretary of tbe Treasury with a letter in which be said:
* * # «n wiii greatly assist Charles Sundberg & Co. in completing their contracts with tbe United States if tbis arrangement can be made, so that tbe final payment may come direct to me, as a security for money- loaned to tbe contractors and used in their work on Government buildings.
“ Please acknowledge receipt of tbis paper, and kindly inform me if I may expect tbe draft to be drawn and forwarded to me as suggested above when tbe proper time shall arrive for issuing it.”
*203 On February 12, tbe Secretary wrote, acknowledging the receipt of the power of attorney, and stating that—
“Under departmental interpretation of the law a power of attorney authorizing the collection of moneys can not be recognized unless issued subsequent to the issue of a draft in payment under the claim therefor, said draft being specifically identified in the power of attorney.
“It will be necessary, therefore, for the voucher, in final payment under the contract in question, to issue in the name. of the contractors; but upon his specific request the same may be presented to you to be held by you for indorsement by the contractors. If this arrangement is satisfactory to yourself and the contractors, please advise the Department, that proper instructions may be given.”
To this Yan Zandt replied that the arrangement would be satisfactory to him as well as to the contractors, and asked that proper instructions be given to produce the result.
The Assistant Secretary, on February 19, sent the following letter to the disbursing agent of the custom-house building:
“ Treasury Department,
“ Washington, D. C., February 19, 1890.
“Mr. N. W. Cuney, .

“Disbursing Agent, Custom-Souse, etc., Galveston, Texas:

“Sir: On the 3d instant a power of attorney was given by Messrs. Charles Sundberg & Co., contractors for the erection of the custom-house, etc., at Galveston, to George Yan Zandt, cashier of the Prairie State National Bank, Chicago, authorizing him to receive the amount due in final settlement under said contract, excepting the interior finish of the building.
“ This paper has been filed with the Department by Mr. Y an Zandt, with the request that the same be registered, so that draft, when issued, may be forwarded to him direct.
“In reply to letter advising him that final voucher could' only be issued in the name of the contractors, but in view of the fact that the authority had been given to secure Mr. Yan Zandt for moneys advanced Messrs. Sundberg & Co. for the purpose of carrying out their contract, the check issued in final payment would be forwarded to him for indorsement by the contractors.
“ To this communication Mr. Yan Zandt replied that such an arrangement would be satisfactory to himself and to the contractors.
“You will please, therefore, make note of the facts, and, when authority shall have been given for final payment under the contract in question, issue your check to the order of the *204 contractors and forward tbe same to Mr. Van Zandt, whose address is P. O. box 143, Chicago, Ill.
“ Respectfully, yours,
“George S. Batcheller,

“Assistant 8eereta/ry.”

The custom-house has been completed, and the retained 10 per cent, amounting to $11,859.60, admitted by defendants to be due, is now payable.
Sundberg & Co. still owe the bank $9,500 on their four promissory notes before mentioned, and the latter sues for so much of the retained 10 per cent.
It can not be doubted, after all the decisions of this court and the Supreme Court on the subject, that the power of at-tory given to Van Zandt is made “ absolutely null and void” by the following section of the Revised Statutes:
“Sec. 3477. All transfers and assignments made of any claim upon the United States, or of any part or share thereof or interest therein, whether absolute or conditional, and whatever may be the consideration'therefor, and all powers of attorney, orders, or other authorities for receiving payment of any such claim, or of any part or share thereof, shall be absolutely null and void, unless they are freely made and executed in the presence of at least two attesting witnesses, after the allowance of such a claim, the ascertainment of the amount due, and the issuing of a warrant for the payment thereof.
“ Such transfers, assignments, and powers of attorney must recite the warrant for payment, and must be acknowledged by the person making them, before an officer having authority to take acknowledgments of deeds, and shall be.certified by the officer; and it must appear by the certificate that the officer,at the time of the acknowledgment, read and fnlly explained .the transfer, assignment, or warrant of attorney to the jmrson acknowledging the same.”
In Lopez’s Case (24 C. Cls. R., 84) we reviewed the decisions on that section, and while we held that a power of attorney to receive payment of a claim, unrevoked and uncontroverted, might be recognized, and payments made upon them to the attorney, at the option of the defendants, in all other cases they are to be held as absolutely void.
In Gillis’s Case (95 U. S. R., 413) the Supreme Court says:
“No language could be broader or more emphatic than these enactments. The words embrace every claim against the United States, however arising, of whatever nature it may be, and wherever and whenever presented.
*205 u So far are they from giving new potency to assignments and transfers of rights in action, so far from, changing the common law rule that such rights are not assignable, the statute strikes down and denies any effect to powers of attorney, orders, transfers, and assignments which-before were good in equity, and which a debtor was bound to regard when brought to his notice.”
The attorney for the bank argues in his brief that the amount due on the contract is a liquidated debt admitted by the defendants, and so not within the ban of the statute (Rev. Stat., sec. 3477). He cites a circular of the First Comptroller, issued in 1853, with the indorsement thereon of Mr. Justice Strong, after the decision in Gillis’s Case, printed in full in Lopez’s Case (24 C. Cls. R., 94.)
It is within my personal knowledge that the cases represented to the consideration of Mr. Justice Strong were those of powers of attorney by judges and other officers of the Government to draw their salaries, and it was with special reference to such cases that he made the indorsement. It must be observed that this was done before the decision in Bailey’s Case (15 C. Cls. R., 490, affirmed on appeal in 109 U. S. R., 432), McKnight’s Case (98 C. Cls. R., 185, affirming the decision of this court in 13 C. Cls. R., 292), and Lopez’s Case above cited, in all of which the doctrine is enunciated as stated in the latter case:
“ The jiractical effect of the law thus interpreted is that such assignments and transfers, whatever be the consideration, are mere naked powers of attorney, revokable at pleasure.”
Probably that was the real meaidng of the First Comptroller’s circular, which concludes as follows:
“ My conclusion is, that ordinary debts and accounts against the Government, which have been legally contracted and never disputedare not claims within the meaning of those statutes, and that the statutes do not apply to them, but apply to uncertain damages and losses, extra allowances, pensions, equitable demands, claims for the correction of alleged errors, claims for a return or repayments of duties, items of account which have been rejected or are disputed, and such classes of cases as are usually referred to the Committee on Claims and to committees other than the Committee of Ways and Means.”
In the light of more recent decisions we must conclude that Mr. Justice Strong did not intend to go further in this note than these later decisions have gone.
*206 It is argued for tbe bank tbat tbe correspondence of tbe Secretary of tbe Treasury, set out in findings vm to x, added force to tbe power of attorney and induced tbe bank to make tbe loan on tbe faitb of tbe representations there made, by wbicb.it acquired an equitable if not a legal right to tbe retained.
It is well settled tbat no officer of tbe Government can do any act which will relieve assignments and powers of attorney from tbe operation upon them of Revised Statutes, section 3477. In McKnight's Case (13 C. Cls. R., 292), tbe Secretary of War made a requisition upon tbe Secretary of the Treasury for a warrant in favor of tbe assignees. Tlie accounting officers (tbe Third Auditor and Second Comptroller) stated an account in their favor; tbe Secretary of tbe Treasury drew a warrant in their name, and tbe First Comptroller countersigned it as “ warranted by law” (Rev. Stat., sec. 269). Part, payment was made thereon by tbe Treasurer.
With all these six high officers of tbe Government recognizing in writing tbe validity of tbe assignment, it was held to be void and of no force.
Tbe question remains whether or not this is all changed by tbe provision of tbe Act of March 3, 1887, chapter 359, section 1 (1 Supp. Rev. Stat., 2d ed., p. 559), giving tbe court jurisdiction of claims “in respect of which claims tbe party would be entitled to redress against tbe United States either in a court of law, equity, or admiralty if tbe United States were suable.”
This question involves more than tbe mere right of an assignee to maintain a suit against tbe United States, which seems to have been tbe only point considered in Emmons v. United States (48 Fed. Rep., 43), cited by counsel for tbe bank. It involves tbe further question whether or not any force or effect can be given in equity or law to contracts declared by statute to be “ absolutely void.”
In Mattox v. Highstine (39 Ind., 95) it was enunciated as a general principle tbat—
“An equity can not grow out of an illegal and void transaction.”
In Gillis’s Case (95 U. S. R., 413) tbe Supreme Court said, what we have quoted in another connection:
“The statute strikes down and denies any effect to powers of attorney, orders, transfers, and assignments which before *207 were good in equity, and wbicb a debtor was bound to regard when brought to bis notice.”
The application of equity in such cases was considered by the Supreme Court in Spofford v. Kirk (97 U. S. R., 484). The court there says:
“We are brought, then, to the inquiry whether such an assignment of a claim against the United States, made before the claim has been allowed, and before a warrant has been issued for its payment, has any validity, either in law or in equity.”
Then, after reciting the statutes, the opinion proceeds to say:
u It would seem to be impossible to use language more comprehensive than this. It embraces alike legal and equitable assignments. It includes powers of attorney, orders, or other authorities for receiving payment of any such claim, or any part or share thereof. It strikes at every derivative interest in whatever form acquired, and incapacitates every claimant upon the Government from creating an interest in the claim in any other than himself.”
The final conclusion in that opinion is this:
u It follows that, in our opinion, the accepted' orders under which the appellant claims gave him no interest in the claim of the drawer against the United States and no lien upon the fund arising out of the claim. His bill was therefore rightly dismissed.”
That was a case in equity by an assignee upon orders drawn upon, not the United States, but upon the attorneys of the original contracter, and accepted payable out of any money received by them from the United States on a claim of such contractor. ' It was brought in the Supreme Court of the District of Columbia, which had full equity powers. And yet in that case and under those circumstances the court held that even in equity the orders were void and of no effect, and that no force whatever could be given to them. On appeal that decision was affirmed.
It is clear from the authorities that one of the objects of the statute was to protect the United States from liabilities, directly or indirectly, at law or in equity, to other claimants than those with whom they have contract relations, and from being drawn into controversies between parties claiming different interests. Here the bank makes ño claim to the whole, but only to part of the money due, and to admit their right *208 would make it necessary to compel tbe defendants to divide tbe indebtedness between different parties.
If no force whatever is to be given to tbe power of attorney to Tan Zandt, then tbe case of tbe bank stands on this: It made loans to Sundberg & Co. upon their promissory notes, for tbe purpose of aiding them to carry on their contract with tbe Government, upon tbe assurance that they were to be paid out of tbe proceeds finally due for tbe work. This was a simple contract debt, and gave tbe bank no ben on tbe money due or which might become due on tbe contract which could be enforced in equity.
It has been held that—
“ Before simple contract creditors can resort to a court of equity to collect their debts or to remove obstacles interposed to collecting them, they must show a lien, or that they have obtained judgments at law tbe collection of which they can not enforce without the aid of a court of equity.” (Reese v. Bradford, 13 Ala., 837.)
So that, with or without the power of attorney, the bank had no valid claim at law or in equity, and their petition must be dismissed.
The bank’s claim being disposed of and out of the way, the next question arises, to whom are the defendants liable1?
Charles A. Hitchcock is the only other claimant in this court or before the Treasury Department. He was one of the sureties of Sundberg & Go. on their bond, given at the same time with the execution of the contract, in the penalty of $30,000, for the faithful performance thereof.
May 3, 1890, the Supervising Architect of the Treasury telegraphed to Sundberg & Go. that unless within eight days they could give evidence of their ability to complete the contract the Government wouid assume charge of the work and complete it at their expense, and at the same time he sent a copy of the telegram to each of the bondsmen. This seems to have made no impression upon any of the bondsmen but Hitchcock, who proceeded to Galveston, and immediately upon his arrival there telegraphed to the Supervising Architect as set out in finding xiv. His proceedings thereafter appear by said finding to have been these:
“ Hitchcock, upon his arrival at Galveston, found the work on the building almost entirely suspended, as the contractors *209 could get no materials, several attachments having been laid on material already on the ground, and some tied up in the frieght house awaiting the payment of freight charges. “
“ The firm of Charles Sundberg & Co., as well as Charles Sundberg individually, were insolvent and without credit or financial standing, and could not get trusted for any material. “
“ Hitchcock thereupon assumed control of the work, took a bill of sale of all material on hand from Charles Sundberg & Co., paid up and settled the claims for which attachments had been made, paid up the mechanics and laborers who were in arrears, put a skilled and experienced expert in charge, and proceeded with the prosecution of the work and completed the same at his own cost and expense.
“ In the course of carrying out the work said Hitchcock incurred a total expenditure of $36,734.18.
“ It was arranged between the contractors, Sundberg & Co., said Hitchcock, and the disbursing officer at G-alveston, that all future checks in payment of the work were to be drawn as before, to the order of Charles Sundberg & Co., and were to be thereupon indorsed by Sundberg, and then turned over to Hitchcock or his agent. This arrangement was carried out, and in this manner Hitchcock received $17,684 previous to November 12,1890, and $3,394.58 since.”
Thus it will be seen that after the failure of Sundberg & Co. Hitchcock alone, upon the call of the defendants and as one of the sureties on the original contract, finished the work
at an expense of. $36,734.18
towards which he has received. 21,078.58
Balance against him. 15,655.60
And if he receives the retained amount. 11,859.60
he will still be a loser to the extent of. 3,796.00
This retained money he claims not as assignee, but as one of the parties as surety on the original contract, and as one who has expended his own money on the work. His case differs very little and only in matters of form from Behan’s Case (18 C. Cls. R., 687), affirmed on appeal (110 U. S. R., 339).
Behan was surety, with others, for one Roy, on a contract for making certain improvements on the harbor of New Orleans. The contract was annulled by the Engineer Office, and the sureties were notified that they had a right to continue the work under the contract if they desired to do so. The sureties were asked to notify the Engineer’s Office in writing if they desired “to continue the work on their own account *210 and under the contráete Beban, as one of tbe sureties, elected to go on with the work. He expended large sums of money in its prosecution and maintained an action therefore in his own name.
The only difference between the positions of Behan and Hitchcock was that in Behan’s case the contract was formally annulled and in Hitchcock’s case it was not; but each-was allowed to go on with the work under the original contract (annulled or not annulled) as a matter of right, on account of being a party thereto as surety on the bond. Thé right of a surety to finish a contract in his own name when his principal is in default has often been recognized by the defendants’ officers. It was so in Behan’s case, as hereinbefore pointed out, and it was so in this case of Hitchcock, as stated in the letter of the Secretary of the Treasury transmitting the case.
But Hitchcock’s right to sue on this contract does not depend altogether upon his having done the work. The claim was transmitted to the court by the Secretary of the Treasury as involving a controversy between Hitchcock and the Prairie State National Bank as the only claimants. (See letter of transmission.) This gave to each of them a right to file the petition, and each is therefore rightly a claimant. The petition of the bank being dismissed, Hitchcock is left as the only claimant, and he lias sustained his claim to the money in controversy.
In completing the contract Hitchcock had expended nearly $4,000 more than all the balance due thereon when the work was finished, including the retained amount now in controversy. This, although held back upon different estimates, was all along payable upon, in the words of the contract, “the completion of the entire work and the approval and acceptance of the same” by the defendants. Had not Hitchcock come forward, put his own money into the work, and finished the contract this retained money would never have become payable to anybody. Not even the bank, had its claim been valid, would have been entitled to it or to any part of it, because the cost of completion was greater than the balance of the contract and the retained amount would have been used up. It was wholly Hitchcock’s money employed in completing the work that makes the amount now in controversy payable at all.
*211 The mere form of tbe judgment is not very material in this court, which is not bound by the strict rules of pleading and practice of the common law. Whether it should be in favor of Charles A. Hitchcock alone or of Charles Sundberg & Co., to the use of Hitchcock, as primarily prayed for them, or of Charles Sundberg & Co. alone, as they pray in the alternative, may be somewhat doubtful.
That Hitchcock is ultimately entitled to the money in controversy is settled, and that the whole of it is to go to him in the end is clear; and we may enter judgment in such form as best to accomplish that result. This may be done by giving judgment in favor of Hitchcock alone. All the defendants ask in that regard is that they shall be protected from any other suits and demands in this matter. This they will be'. Sundberg & Co., the original contractors, never have been claimants before the Treasury Department. They filed a petition in this court with the petition of Hitchcock, in which they pray for judgment in favor of the latter. By that prayer they will be forever estopped from setting up a claim in their own behalf if we give judgment, as they request, in favor of Hitchcock.
The judgment of the court, upon the petitions of Charles A. Hitchcock and Sundberg & Co., is that Charles A. Hitchcock recover the sum of $11,859.60.