**FERGUSON & EDMONDSON CO. v. UNITED STATES.**

**No. 45668.**

United States Court of Claims.

March 6, 1950.

Louis M. Denit, Washington, D. C., for the plaintiff. Brandenburg & Brandenburg, Washington, D. C., were on the brief.

Carl Eardley, Washington, D. C., with whom was Acting Assistant Attorney General Newell A. Clapp, for the defendant.

Before JONES, Chief Judge, and LITTLETON WHITAKER, MADDEN and HOWELL, Judges.

JONES, Chief Judge.

This is a suit to recover damages for alleged misrepresentation and arbitrary and capricious action on the part of the contracting officer. Plaintiff also sues to recover for two items of extra expense which it claims to have incurred in fulfilling the contract.

By contract dated September 16, 1936, plaintiff corporation agreed to furnish the materials and perform the work necessary for the relocation of a portion—5.92 miles —of the Baltimore and Ohio Railroad located in Tuscarawas and Sparta Counties, Ohio. The plaintiff, with the consent of the defendant, subcontracted to Ceylon E. Lovejoy a portion of the work constituting about seven-eighths of a mile. The subcontract work involved excavating Nimishillen Creek channel, and placing the materials excavated in two embankments to be used as a roadbed for the railroad and to act as levees. Plaintiff was to receive 33 cents a cubic yard for unclassified excavation, and 35 cents a cubic yard for borrow. The subcontractor, the real party in interest in this action, was to receive payment from the contractor at the rate of 27 cents per cubic yard.

The contract drawings, which were available to bidders and which were examined by plaintiff's subcontractor, contained data, taken from core borings made at the site, indicating that the materials to be removed were largely sands and silts with some rock and coal fragments, sandstone, and dark shale.

The Invitation to Bid stated that bidders were expected to visit the site and acquaint themselves with all available information concerning the nature of the materials to be excavated. The contract specifications further provided that the character of the materials, as indicated on the drawings, was not guaranteed.

Prior to submitting his bid, the plaintiff's subcontractor visited the site, investigated the kind of equipment deemed best suited for the job, and studied the report of the test borings. In making his bid, he relied upon what the plans showed as to the character, location, quantity, and condition of the materials to be excavated.

The subcontractor began operations in late April 1937 using LeTourneaus, which are scrapers with large wheels, these scrapers being drawn by tractors. He had anticipated that with the exclusive use of this type of equipment he could finish the subcontract work within about four months. The south part of the subcontract work was low-lying and visibly wet. The equipment which the subcontractor first brought to the site was incapable of handling this wet material. He later brought in draglines and completed the operations about 60 days later than he had anticipated. This delay was due almost entirely to the unusual rainfall which occurred during the summer of 1937.

The contract stipulated that the excavated materials from the channel change were to be used in the levee-embankment unless otherwise directed by the contracting officer. Materials which in the judgment of the contracting officer were unsuitable for use in the levee-embankment were to be wasted.

At the beginning the subcontractor was excavating mostly sand and gravel. During that period there was no need for borrow and none was authorized. In July, 1937 the contracting officer authorized the use of a limited amount of borrow. At about that time the plaintiff made the claim that the materials then being excavated were not as represented by the contract drawings, and were not suitable and therefore should be wasted. The contracting officer thereupon investigated the conditions of which plaintiff complained and made a finding that the materials were as represented and were suitable. The plaintiff did not appeal from this finding.

As the work progressed a larger proportion of unsuitable materials was encountered and the contracting officer began to allow the use of borrow in increasing amounts. In late October he began to fear that the work would not be completed before winter weather stopped all operations. He therefore on October 27, 1937, authorized the unlimited use of borrow. This authorization continued until the work was completed in November.

Plaintiff contends the defendant breached the contract in that it misrepresented a material fact since the materials to be excavated were of a different character than shown by the defendant's test borings on which plaintiff relied. Plaintiff further alleges that the defendant's requirement that these different materials be used amounted to an unreasonable and arbitrary abuse of discretion resulting in loss to the plaintiff. When protest was made to the contracting officer early in July 1937, an investigation was made and the contracting officer made findings that the materials encountered up to that time were as represented and were suitable for use in the embankment. The plaintiff did not appeal.

The evidence on the question of misrepresentation is voluminous as well as conflicting. Plaintiff testified that it was deceived and misled to its damage by the defendant's characterization of certain areas to be excavated as fine sand rather than silt, and silt rather than clay.

The data supplied to plaintiff by defendant showed that at three specific locations the materials found by the defendant consisted largely of silts and sands, but that there were also some rock and coal fragments and a small area of sandstone and dark shale. Defendant contends that the materials actually excavated were approximately as indicated on the plans.

Plaintiff contends that the materials actually excavated were not of the character shown on the plans and specifications. In support of this contention plaintiff introduced in evidence laboratory analyses of soil samples made after the completion of the contract in 1938 and in 1943, which samples were composed entirely of silt and clay. If the materials used by plaintiff's experts in their tests had been representative generally of soil in the channel change, the job would have mired down and would have been practically impossible of completion. As we have found, the materials so tested by plaintiff were representative only of the finest soils encountered, whereas the materials actually excavated in the performance of the contract were substantially as represented on the contract plans. The presence of some clay in a silt deposit does not support plaintiff's charge of misrepresentation and there is no evidence that defendant withheld any information or was negligent in taking its test borings. If plaintiff had desired more detailed information concerning the character of the soil in the channel change it could have made its test at the time it investigated the project site.

It appears to us that the above circumstances afford little basis for a charge of misrepresentation. What was said by this court in Lovell v. United States, 61 Ct.Cl. 756, 761, with respect to quantity can be applied to this case with respect to quality. The court there said: "It is idle to contend that the representations of the blue prints admit of no variation as to quantity, and the defendant be held to a degree of exactness which common experience has long since established as impossible of attainment in this class of work."

Plaintiff further contends that the materials placed in the embankment-levee were unsuitable and the requirement of the con-

tracting officer that these materials be used was unreasonable and arbitrary and constituted an abuse of discretion.

Article 4 of the prime contract provided that in the event of changed conditions the contracting officer should, with written approval of the head of the department, modify the contract "to provide for any increase or decrease of cost and (or) difference in time resulting from such conditions." The contracting officer under Contract Specification 4–18(b) was the judge as to the suitability of the materials to be used and the material to be wasted.

It is clear from the evidence that substantial portions of the excavated material would have been unsuitable if used exclusively. Much of the excavated material was saturated and was not a free-draining material. If was impervious and unfit for the outer covering of an embankment-levee, but was suitable for the inner core of such construction.

The contractor's attention was called to the fact that the use of some borrow would probably be necessary by a reference in the specifications to 70,000 cubic yards of borrow material. Finer materials have been used for like purposes and impervious materials as well as pervious are needed for this type of construction.

The contract stipulated that the contracting officer was to determine the suitability of the materials to be used for the formation of the embankment-levees. Contract Specification 4-18(b) reads in part: *"Unsuitable Materials.*—Materials unsuitable in the judgment of the contracting officer, for the formation of roadway embankments that will serve as levees shall be disposed of in waste banks. * * *"

The contract gave no standard of suitability. The question was left entirely to the judgment of the contracting officer. As this court said in the case of Wm. Eisenberg & Sons, Inc., v. United States, 75 F. Supp. 1006, at page 1009, 110 Ct.Cl. 388, at page 422: "Under the specifications it was the exclusive function of the contracting officer to determine the suitability of material. As far as plaintiff was concerned, if the contracting officer approved the material, it was suitable."

In the instant case the contracting officer, upon plaintiff's complaint that the materials being excavated were unsuitable, visited the site and inspected the materials and found them to be suitable for the contract purpose. It is significant in this regard that at all times since construction the embankments have been serving the purpose for which constructed. Under Specifications 4–18(b) the materials were to be gauged by their suitability for formation of the embankment-levee and not by their readiness for. use. The contracting officer did not require the plaintiff to place in the embankment materials not called for or contemplated by the specifications. In connection with this claim, therefore, we cannot say that the contracting officer acted arbitrarily. On the contrary, we find that there is substantial evidence to support his rulings.

There were unusual rains, especially in the month of July 1937, which materially delayed plaintiff's work and affected his use of materials. In consequence defendant issued a change order allowing plaintiff 70 additional days within which to complete the work.

Plaintiff also seeks reimbursement for payments in the amount of $381 made to Clara C. Rice for the right to waste materials on her land. Plaintiff bases this claim on the theory that the expenditure was a benefit to the defendant.

Defendant was required under the contract specifications to furnish areas for the deposit of waste materials. Defendant designated a place at the southerly end of the work area for such purpose. The deposit of such materials at the place designated would have entailed hauling and plaintiff found it would be more convenient to cast it by dragline directly from the area being excavated onto the Clara C. Rice property. Accordingly, plaintiff entered into an agreement with Clara C. Rice and other owners of the land alongside the channel cut by which it secured permission to deposit materials on their lands.

Plaintiff made request for reimbursement for this item and the request was rejected by the defendant. No appeal therefrom was taken.

There was no agreement by defendant to reimburse plaintiff for the sum expended in acquiring the right to place waste on the Rice property. Since defendant had furnished the plaintiff with a waste area this additional arrangement by plaintiff was for its own convenience, and for this reason no recovery can be had for this item. In these circumstances the defendant should not be required to reimburse the plaintiff.

Plaintiff's third and last claim is for reimbursement for $1,008.03 expended in the purchase and use of borrow materials from private borrow pits.

Plaintiff's request for reimbursement for this expenditure was rejected by defendant and no appeal was taken.

Since the defendant had given permission for plaintiff to use private borrow on the condition that it do so at its own expense, no recovery can be had on this claim.

Plaintiff is not entitled to recover and the petition is dismissed.

HOWELL, MADDEN, WHITAKER and LITTLETON, Judges, concur.